Minute Order Form (06/97)

JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7612 | **DATE** | 3/27/2002 |
| **CASE TITLE** | Craig D. Gates vs. Johnson Worldwide Associates, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, JWA's motion for summary judgment is GRANTED against Gates on Gates' claims [24-1]. This Court finds pursuant to Fed. R. Civ. P. 56(d) that the amount in controversy in JWA's counterclaim is $30,000, significantly less than the jurisdictional amount in 28 U.S.C. § 1332(a). Accordingly, this case is remanded to the Circuit Court of Illinois for further proceedings.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | MAR 2 8 2002 | | 37 |
| | Notified counsel by telephone. | | date docketed | | |
| X | Docketing to mail notices. | | | | |
| X | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| klb (lc) | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG D. GATES, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | No. 00 C 7612 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| JOHNSON WORLDWIDE ASSOCIATES, INC., a Wisconsin corporation, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

### MEMORANDUM OPINION AND ORDER

Craig D. Gates ("Gates") brought suit against Johnson Worldwide Associates ("JWA") alleging that JWA breached the February 22, 1990 Licensing Agreement regarding Gates' invention of an electronic boat speedometer. Specifically, the complaint alleges that JWA failed to fulfill its duty to develop, patent, manufacture and market products based on Gates' invention. JWA filed a counterclaim seeking a refund for minimum royalty payments made to Gates after January 1, 1992, when the absence of a patent for the Licensed Product allegedly terminated Gates right to receive minimum royalties. Before this court is JWA's motion for summary judgment pursuant to Fed. R. Civ. P. 56. JWA argues that it is entitled to summary judgment because (1) the "best efforts" provision contained in the Exclusive License Agreement (the "Agreement") is unenforcably vague and (2) Gates' rights to minimum royalty payments terminated under the Agreement when no patent issued on Gates' licensed product prior to

-1-

January 1, 1992. For the reasons set forth below, JWA's motion for summary judgment is granted on Gates' claims.

## I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir. 2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will

bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511.

## II. Factual Background

The following facts are taken from the parties' Local Rule 56.1(a)(3) and (b)(3) Statement of Material Facts. Gates is an individual currently residing in Mead, Washington. JWA is a Wisconsin corporation with its principal place of business in Wisconsin. Airguide Instrument Company, a division of JWA, manufactures and distributes components and devices for various water craft. JWA is registered to transact business in Illinois and the written agreement that is the subject of this lawsuit was substantially negotiated in this judicial district.

Gates first approached Airguide with his idea for an electronic boat speedometer at some point in time prior to June 14, 1988. Gates' electronic speedometer contemplated using a sensor to detect water pressure as a boat moves along in the water and send a signal to the boat's instrument panel, which would translate that water pressure into a measurement of speed. Current (both in 1988 and 2001) "mechanical" boat speedometers measure speed by using the water pressure created as a boat moves through the water to physically funnel water through a tube to the boat's instrument panel, which contains a pressure gage that translates the pressure measurement into a speed measurement (miles per hour). Gates has asserted that the electronic speedometer offers slightly enhanced accuracy over mechanical speedometers, quicker feedback, and reduced weed fouling.

On approximately June 14, 1988, Airguide expressed interest in developing Gates' idea and began negotiating an exclusive licensing agreement. On October 5, 1988, Gates, through his counsel, circulated a draft of the Agreement containing several modifications to an original draft of the Agreement provided by JWA. Throughout the negotiation process, the parties modified, added, and deleted many provisions in the Agreement, resulting in the circulation of numerous drafts. After over a year of discussion and negotiation, on February 22, 1990, Airguide and Gates executed the Agreement, which granted Airguide an exclusive license to sell the electronic boat speedometer concept proposed by Gates (the "Licensed Product") for a period of twenty years or so long as Airguide continued to manufacture the licensed product, whichever was shorter. In exchange, Airguide agreed to pay Gates minimum royalty payments in the amount of $10,000 per year, or payments equal to 5% of net sales of the licensed product, whichever was greater. The final Agreement contains the unmodified "best efforts" provision contained in Gates' October 5, 1988 version of the Agreement, which states as follows:

> Airguide shall exercise its best efforts in connection with development, manufacture, patenting, marketing and distribution of the Licensed Products, with a view toward maximizing its profits and Gates' royalty income from the exploitation of the Licensed Inventions.

The version of the Agreement circulated by Gates on October 5, 1988 contemplated assigning JWA the following responsibility for preparing, filing, prosecuting, and funding the patent applications:

> After GATES has provided all necessary information, drawings, blueprints, and other data, and has executed all necessary papers, documents and instruments, AIRGUIDE shall cause to be prepared, filed and prosecuted, at its own expense, in the name of GATES and with the least possible delay, an application or applications for letters patent of the United States on the Licensed Invention....

In the final version of the Agreement, the parties agreed that Airguide and Gates "will jointly evaluate and select patent counsel" who will file the application. The agreement provided that the patent application will be in the name of all inventors who contributed to the final product. The agreement also provided that Airguide would pay 50% of the cost of prosecuting the patent and would advance the other 50% of such costs and recoup that advance from future owned royalties. In addition, Gates agreed to omit a provision that would have ensured that the Agreement "is not contingent or dependent in any way upon the issuance of [a] patent" for the Licensed Invention. Instead, the final Agreement terminates Gates' right to receive minimum royalties in the event that a patent on the Licensed Product did not issue on or before January 1, 1992. In particular, the Agreement provides the following:

> If, on January 1, 1992, there shall be no issued United States patents covering any of the Licensed Products then being made or sold by Airguide hereunder, Airguide's obligation to pay a minimum annual royalty hereunder, as provided in paragraph 5.2, shall terminate, and Airguide's only royalty obligation to Gates shall be with respect to the payment of earned royalties.

On July 30, 1990, Airguide informed Gates that Airguide intended to introduce a speedometer based on Gates' design to the market in September 1991. In 1990, Airguide learned of an electronic speedometer being developed by a company known as TRE. In April 1991, Gates was advised of the TRE invention and patent and of Airguide's interest in licensing that invention. Gates was asked to evaluate the TRE invention. Gates negotiated an amendment to his License Agreement. The amendment provided that no matter whether the final product was built with TRE's technology or Gates' technology, Gates would get the same earned royalties. In September 1991, Airguide entered into a license agreement with TRE. Morey Corporation was an engineering firm retained by JWA to manufacture the speedometer and to provide design

consultation. In early 1992, the development of the speedometer was brought to a virtual halt for 6-7 months.[1] The assets of Airguide were purchased by JWA and the license agreement was assigned by Airguide to JWA. In 1993, JWA and its consultants, decided to change Gates' invention to provide for an "analogue to digital; digital to analogue" interface between the speedometer sensor and the speedometer gauge. In 1994, JWA estimated that it would sell 31,200 Licensed Products in the period from 1994 to 2000 and that sales revenue for the product over that period would be $9,512,908.

In August of 1993, JWA notified the project manager to "slow the project down" as it was no longer a critical part of JWA's plans. On January 26, 1994, JWA was considering cancelling the Accupro project. One of the costs of cancellation was the $160,000 in minimum royalties to be paid to Gates. Through and including 1994, JWA paid Gates annual minimum royalty payments, totaling approximately $37,500. In 1995, JWA began selling the Licensed Product under the brand name "Accupro". Throughout 1995 and 1996, JWA sold only 168 units of the Licensed Product, which generated $26,511 in net sales. JWA paid Gates approximately $10,000 in royalties on sales of the Licensed Product in 1995 and 1996. In December 1995, JWA's manager was recommending to JWA management that the Accupro project be abandoned. The Accupro targeted a market which highly prized the level of accuracy promised by the Accupro.[2] JWA determined that, in order to penetrate either the original equipment manufacturer ("OEM") market or the end-user or "aftermarket", JWA would have to reduce the

---

[1] Gates alleges that manufacturing stopped because Morey fired all of its engineers whereas JWA alleges that the engineers quit.

[2] JWA contends that the market was the waterski-racing industry while Gates asserts that the market was the waterski industry.

price, and thus the cost, of the Accupro by 50%. JWA decided to cease manufacturing the Licensed Product.³ In January 1997, JWA decided to advise Gates that JWA was abandoning the project. JWA was aware that one of the risks of abandoning the project was a legal action by Gates.

## III. Discussion

JWA argues that it is entitled to summary judgment because Illinois courts, as a matter of law, generally do not enforce "best efforts" provisions such as that contained in the Agreement. As to Gates' second claim, JWA argues that the undisputed facts show that Gates received all Earned Royalties arising from sales of the Licensed Product. JWA provided Gates with sales records and Gates now acknowledges that JWA is entitled to summary judgment on the second claim. Finally, JWA argues that it is entitled to summary judgment on its counterclaim because the facts show that JWA continued to pay Gates minimum royalties each year through and including 1994, even after Gates' rights to such royalties had terminated. Thus, according to JWA, Gates must refund the minimum royalties paid to him after January 1, 1992.

Illinois courts have found "best efforts" clauses to be void and unenforceable for vagueness unless "there are objective criteria present by which to judge whether the proper effort has been made." Heritage Remediation Engineering, Inc. v. Wendnagel, No. 89 C 413, 1989 WL 153373, *6, 1989 U.S. Dist. LEXIS 13775, *16 (N.D. Ill. Nov. 9, 1989). While the Heritage court enforced the "best efforts" provision at issue there, the court's analysis highlights the deficiencies in the "best efforts" provision at issue here. In Heritage, the court found that the

---

³JWA claims that the decision to cease manufacturing the product was made in 1997 while Gates contends that the decision was made in December 1995 and Gates was not notified of said decision until 1997.

short duration of the performance period and the explicit criteria by which to measure the defendant's promise to use its best efforts to remove contaminated soil rendered the "best efforts" provision enforceable. Id. In particular, the "best efforts" provision in Heritage included the following objective criteria: (1) weight estimates of the potentially contaminated soil and (2) a target level of no more than 2.1 ppm of xylene in the soil. Id. In Ralph v. Karr Manufacturing, another case where a "best efforts" provision was upheld, the "best efforts" provision included a detailed description of the parties expectations, and an extensive list of duties and responsibilities, which the defendant had agreed to put forth his "best efforts" in performing. 20 Ill. App.3d 450, 453, 314 N.E.2d 219, 222 n.1 (Ill. App. Ct. 1974).

The Court has carefully reviewed the parties' Agreement and has concluded that it contains no such objective criteria that would enable either the Court or the jury to determine what was required of JWA in order to satisfy the "best efforts" clause. The "best efforts" provision states, in its entirety: "Airguide shall exercise its best efforts in connection with development, manufacture, patenting, marketing and distribution of the Licensed Products, with a view toward maximizing its profits and Gates' royalty income from the exploitation of the Licensed Inventions." The Agreement imposes no minimum obligations on JWA with respect to the development, manufacture, patenting, marketing or distribution of the Licensed Product; instead, it merely imposes on defendant an obligation to utilize its "best efforts." In addition, the "best efforts" provision lacks any criteria regarding the amount of funds that should be assigned to the project, the number or type of personnel that should be assigned to the project, deadlines by which the project should reach certain stages of completion, or the type and amount of advertising JWA should utilize to market the Licensed Product. Absent such objective criteria,

the "best efforts" provision is unenforceable. See Heritage, 1989 U.S. Dist. LEXIS 13775, at *16. Further, it should be noted that Gates actively participated in the negotiation and drafting of the Agreement, including the "best efforts" provision, for over a year. Gates could have negotiated or at least proposed specific requirements or criteria by which to measure JWA's "best efforts." This Court will not reward his failure to do so by reading requirements into the contract that did not exist at the time it was signed. As the "best efforts" provision is unenforceable because it is vague, this Court will not address Gates' argument that the parameters of the "best efforts" provision must be construed in light of JWA's implied obligation to act with good faith and fair dealing. Accordingly, summary judgment is granted in favor of JWA.

As this Court has granted summary judgment in favor of JWA on Gates' claims, this Court conclusively finds pursuant to Fed. R. Civ. P. 56(d) that the amount in controversy is $30,000, the amount of JWA's counterclaim. This case was removed from state to federal court pursuant to 28 U.S.C. § 1441 (b). Under 28 U.S.C. § 1332(a), $30,000 is not adequate to meet the amount in controversy requirement. Therefore, this Court does not have subject matter jurisdiction in this matter and the case is remanded to the Circuit Court of Illinois.

## Conclusion

For the foregoing reasons, JWA's motion for summary judgment is GRANTED against Gates on Gates' claims. This Court finds pursuant to Fed. R. Civ. P. 56(d) that the amount in controversy in JWA's counterclaim is $30,000, significantly less than the jurisdictional amount in 28 U.S.C. § 1332(a). Accordingly, this case is remanded to the Circuit Court of Illinois for further proceedings.

Enter:

*David H. Coar*
David H. Coar
United States District Judge

Dated: March 27, 2002